Joseph A. Mullaney, III, Esq.
**CONSUMER LITIGATION GROUP**
Law Office of Dimitrios Kolovos, LLC
211 West State Street, Suite 204
Media, PA  19063
Tel 610-616-5303
Fax 610-672-1944
Eml JMullaney@ConsumerLitigators.com

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANITA N. WEIKEL, a citizen of the Commonwealth of Pennsylvania,<br><br>  Plaintiff,<br><br>  v.<br><br>PATENAUDE & FELIX A PROFESSIONAL CORPORATION, a professional corporation of the State of California,<br><br>  and<br><br>JOHN DOES I – X, in their individual capacities, and as agents for Patenaude & Felix A Professional Corporation,<br><br>  Defendants. | DOCKET NO.:<br><br>**CIVIL ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## PARTIES

1. Plaintiff is a citizen and resident of the Commonwealth of Pennsylvania residing in Cumberland County.

2. Defendant PATENAUDE & FELIX A PROFESSIONAL CORPORATION, a professional corporation of the State of California ("P&F"), is an artificial person and regularly conducts business in the Commonwealth of Pennsylvania and is principally located at 4545 Murphy Canyon Road, 3rd Floor, San Diego, CA 92123.

3. Defendants JOHN DOES I – X ("John Does"), in their individual capacities, and as agents for Patenaude & Felix A Professional Corporation, are natural persons and regularly conduct business in the Commonwealth of Pennsylvania.

4. Defendants are agents of each other and acted to each other's benefit within the course and scope of their agency and acted in concert with each other; therefore, the Defendants are individually, jointly, and severally liable for the violations and damages described in this Complaint.

5. Defendants are agents of Target National Bank ("Target) and acted to Target's benefit within the course and scope of their agency and acted in concert with Target; therefore, Target may be individually, jointly, and severally liable for the violations and damages described in this Complaint.

## JURISDICTION AND VENUE

6. Subject matter jurisdiction is proper pursuant to 15 U.S.C. § 1692k(d), 28 U.S.C. § 1331, and 28 U.S.C. § 1337.

7. Personal jurisdiction is proper pursuant to 42 Pa. C.S.A. § 5322.

8. Supplemental jurisdiction over Plaintiff's state-law claims is proper pursuant to 28 U.S.C. § 1367.

9. Declaratory judgment is available pursuant to 28 U.S.C. § 2201.

10. Venue in the United States District Court for Middle District of Pennsylvania is proper pursuant to 28 U.S.C. § 1391(b) because the acts and omissions complained of in this Complaint occurred in the County of Cumberland in the Commonwealth of Pennsylvania and because the Defendants conduct business within the County of Cumberland.

## FACTUAL ALLEGATIONS

11. Plaintiff repeats the foregoing Paragraphs as if each were reprinted herein below.

12. The Defendants alleged that Plaintiff owed a Target National Bank account issued for the purposes of financing the goods and services offered by the national retailer, Target Brands, Inc. (also known as Target).

13. Although Plaintiff did have a Target account, she disputes the amount of money Target alleged she owed.

14. Target National Bank issued the alleged account so that Plaintiff could purchase goods and service of a personal, family, or household nature from Target Brands, Inc.

15. Plaintiff purchased credit from Target National Bank so that she could buy goods and services from Target Brands, Inc.

16. Prior to April 30, 2009, Defendants alleged that Plaintiff owed a consumer debt in the nature of a consumer Target credit card account (approximately $6000.00).

17. Prior to April 30, 2009, Defendants obtained a default judgment against Plaintiff in a state court.

18. Prior to April 30, 2009, the default judgment acted as a lien on Plaintiff' real estate consisting of her marital home.

19. Prior to April 30, 2009, Plaintiff was trying to close on a real estate mortgage financing that was put on hold until Plaintiff could resolve the state-court judgment in favor or Target and satisfy the lien.

20. Upon information and belief, on or about April 30, 2009, Plaintiff's agent, Clear Debt Results ("CDR"), communicated a possible settlement offer of $3500.00 to the Defendants to satisfy the judgment lien and to obtain a zero-balance letter.

21. Upon information and belief, on or about April 30, 2009, Defendants stated that they would accept the settlement offer communicated by CDR and, the Defendants offered to accept $3500.00 to satisfy the judgment lien and transmit a zero-balance letter.

22. On or about May 1, 2009, Plaintiff instructed CDR to advise Defendants that Defendant's settlement offer was agreed.

23. Upon information and belief, on or about May 1, 2009, CDR advised the Defendants that Plaintiff accepted the $3500.00 in accord and satisfaction and in exchange for a "zero-balance letter" (the "First Settlement Agreement").

24. Upon information and belief, on or about May 1, 2009, CDR advised Plaintiff that the First Settlement Agreement was no longer valid because it was only good until the end of the month (April 30, 2009) though this detail was not previously disclosed to CDR or the Plaintiff.

25. On or about May 1, 2009, Plaintiff telephoned the Defendants who confirmed that the less-than-one-day First Settlement Agreement was no longer valid and that Target would not accept the $3500.00 in accord and satisfaction nor provide a zero-balance letter.

26. During that same telephone conversation, Defendants advised Plaintiff that the "new" settlement amount was now $4182.56.

27. During that same telephone conversation, Plaintiff protested the attempted dishonoring of the First Settlement Agreement, and stated that it was unfair for Defendants to renege on a settlement agreement with hidden terms.

28. During that same telephone conversation, Defendants advised that if she did accept and pay the $4182.56 "offer" by the end of May 2009, the settlement amount would be even higher.

29. During that same telephone conversation, Plaintiff reluctantly agreed to pay $4182.56 in exchange for satisfaction of the judgment lien and a zero-balance letter (the "Second Settlement Agreement").[1]

30. During that same telephone conversation, Defendants caused Plaintiff to believe that they were negotiating the Second Settlement Agreement outside of Plaintiff's earshot with Target itself.

31. During that same telephone conversation, Defendants led Plaintiff to believe that the Defendants had Target on the "other line" and placed Plaintiff on hold to discuss the Second Settlement Agreement with Target.

32. On or about May 1, 2009, Plaintiff's real estate loan closing was postponed until May 8, 2009, so that she could resolve the judgment lien.

---

[1] Plaintiff denies that the Second Settlement Agreement superseded the First Settlement Agreement or that the First Settlement Agreement became void or unenforceable. To the contrary, Plaintiff seeks to enforce the First Settlement Agreement, derivatively, through her consumer law claims, *infra*. Additionally, Plaintiff denies that she owed any money to Target. Instead, she was trying to close on a real estate loan, and there was not enough time to challenge or dispute the alleged Target account or the judgment lien. Hence, she engaged in settlement discussions. Plaintiff intended to deal with the alleged Target account and judgment after her real estate loan closed by disputing that she owed anything to Target.

33. On or about May 1, 2009, Plaintiff's real estate attorney provided explicit instructions for obtaining settlement documents from the Defendants if she were able to work out a "new" settlement agreement.

34. On or about May 1, 2009, Plaintiff telephoned Defendants and spoke with an agent who advised that Defendants could provide a letter to Plaintiff that stated, "If appropriate, our offices will file a release of lien and/or satisfaction of judgment."

35. During that same telephone conversation, Defendants' agent advised the Plaintiff to telephone Defendant's San Diego office and ask for "a $0.00 settlement letter for purposes of title closing as per the Carnegie office."

36. On or about May 1, 2009, Plaintiff telephoned Defendants' San Diego office and spoke with "Mike Boulanger" and advised him of Plaintiff's real estate issue and her need for a settlement letter upon her payment pursuant to the Second Settlement Agreement.

37. During that same telephone conversation, "Mike Boulanger" stated that if Plaintiff paid the Second Settlement Agreement amount by the end of May 2009, he would fax a letter to Plaintiff containing the above specifications advised by her real estate attorney.

38. During that same telephone conversation, "Mike Boulanger" stated that before the letter could be faxed, he would need the approval of "Frank."

39. During that same telephone conversation, "Mike Boulanger" would place Plaintiff on hold and advise that he was speaking to Target for authority in which to settle the judgment lien.

40. On or about May 1, 2009, Plaintiff telephoned the Defendants and spoke with "David," and she advised of her prior conversations with Defendants' Carnegie office and "Mike Boulanger."

41. During that same telephone conversation, Plaintiff advised "David" of her need for the settlement letter written to her real estate attorney's specifications.

42. During that same telephone conversation, Plaintiff advised that the settlement letter should cover May 2009, *i.e.*, permit payment by the end of May 2009.

43. During that same telephone conversation, "David" advised the Plaintiff that she would have until the end of May 2009 to pay pursuant to the Second Settlement Agreement, but that a settlement letter would say that payment was due by May 15, 2009, because of the fashion in which the Defendants' computer programs were written.

44. During that same telephone conversation, when Plaintiff asked what would happen if she did not pay by May 15, 2009, "David" advised that nothing negative would happen and that the Second Settlement Agreement would

still be valid and that Plaintiff would still have to the end of May 2009 to make the payment.

45. During that same telephone conversation, "David" advised that he was speaking with Target in order to obtain its approval for Plaintiff's requests.

46. On or about May 1, 2009, Plaintiff telephoned the Defendants and spoke with the above-referenced "Frank."

47. During that same telephone conversation, "Frank" advised Plaintiff that the Defendants do not typically send out settlement letters, but he had authorized "Mike Boulanger" to do so.

48. On or about May 1, 2009, Gregg L. Morris, an attorney with the Defendants sent a facsimile to Plaintiff stating that if she made a payment of $4187.00 by May 15, 2009, Defendants would consider the judgment paid in full.

49. Within that facsimile, Gregg L. Morris stated that payment was due by May 15, 2009, despite "Frank" and others advising Plaintiff that she had until the end of May 2009 to pay the Second Settlement Amount.

50. Plaintiff did not think anything of the inconsistency because she was already advised by the Defendants that the letter would reference May 15, 2009 and that she had until the end of May 2009 to pay pursuant to the Second Settlement Agreement.

51. On or about May 6, 2009, Plaintiff was able to reschedule the real estate loan closing until May 20, 2009, relying on "Frank's" representation that she had until the end of May 2009 to pay pursuant to the Second Settlement Agreement.

52. On or about May 14, 2009, Plaintiff went to Western Union to wire $4187.00 to the Defendants using her debit card after making a deposit in excess of $4000.00 obtained from a family member.

53. While at Western Union, Plaintiff was advised just prior to closing that Western Union would not accept a debit card and that Plaintiff needed to obtain cash for the wire transfer.

54. While at Western Union, Plaintiff was concerned but believed she had until the end of May to pay pursuant to the Second Settlement Agreement, and it was still before her May 20, 2009 real estate closing.

55. On or about May 18, 2009 at 1:10 p.m., two days before her real estate loan closing and several days before the end of May 2009, Plaintiff wired $4187.00 to the Defendants in full and final satisfaction of the judgment lien.

56. Upon information and belief, on or about May 19, 2009, Plaintiff's real estate attorney telephoned Defendants and was advised that since Plaintiff's

payment was not received by May 15, 2009, Defendants would have to consider "honoring" the Second Settlement Agreement.

57. On or about May 20, 2009, Plaintiff telephoned the Defendants and spoke with "David" where he advised Plaintiff that Defendants were coordinating with Plaintiff's real estate attorney.

58. During that same telephone conversation, "David" advised that the Defendant's were waiting for "Frank" to come into the office to resolve the matter.

59. Upon information and belief, on or about May 20, 2009, Plaintiff's real estate attorney's agent contacted Defendants where "Frank" advised that since Plaintiff's payment was not received by May 15, 2009, the Second Settlement Agreement was void and that Plaintiff now owed an additional $1,268.29 in addition to the $4187.00 she already paid.

60. On May 20, 2009, Plaintiff's real estate attorney's agent advised Plaintiff that the real estate loan closing would not occur later that day without written proof of the accord and satisfaction.

61. On or about May 20, 2009, Plaintiff telephoned Target directly to discuss the dishonoring of the Second Settlement Agreement and the deception employed by the Defendants.

62. During that same telephone conversation, "Tee" of Target advised Plaintiff that once Target placed an account with a law firm, that law firm is empowered to make any and all decisions including the decision to sue or settle.

63. During that same telephone conversation, "Tee" advised that Target had nothing to do with the First or Second Settlement Agreements and was accepting whatever its attorneys deemed best.

64. During that same telephone conversation, "Tee" advised that Target had no conversations with the Defendants regarding the settlement of the judgment lien.

65. On or about May 20, 2009, Plaintiff telephoned the Defendants and spoke with "Frank" and advised him of her conversation that Target disclaimed any responsibility for the Second Settlement Agreement or its dishonor by the Defendants on behalf of Target.

66. During that same telephone conversation, Plaintiff stated that the Defendants had the authority to resolve the alleged Target account on any terms.

67. During that same telephone conversation, "Frank" stated that because Plaintiff did not make the payment on time, there was nothing that could be done other than to transfer her to Victor Patenaude.

68. During that same telephone conversation, "Frank" denied that "Mike Boulanger" and others would have stated that Plaintiff had until the end of May 2009 to make the settlement payment.

69. During that same telephone conversation, "Frank" advised the Plaintiff that she would not be in her predicament if she was not the scum of the earth and had paid her bills like everyone else in America.

70. During that same telephone conversation, after "Frank" had insulted Plaintiff, he abruptly disconnected the telephone call.

71. On or about May 20, 2009, Plaintiff telephoned the Defendants and spoke with Victor Patenaude.

72. During that same telephone conversation, Plaintiff pleaded with Victor Patenaude, advised him of the real estate loan closing, the monthly savings Plaintiff's family would realize if the real estate loan closing (refinance of Plaintiff's existing mortgage) closed, her request that the Second Settlement Agreement be honored, and requested that he consider the Target account paid in full as agreed by the parties.

73. During that same telephone conversation, Plaintiff advised Victor Patenaude that she had contacted Target and learned that his law firm had the power to agree to any settlement terms and to complain of the insults issued by "Frank."

74. During that same telephone conversation, Victor Patenaude screamed at the Plaintiff so loud that he injured her ear drum before she could fully take the telephone away from her ear.

75. During that same telephone conversation, Victor Patenaude screamed indecipherably in between screams about Plaintiff communicating with a represented party and that she was not authorized to communicate with Target.

76. On or about May 20, 2009, and since, as a result of Defendants' debt collection misrepresentations and deceptions, Plaintiff was not able to close on the real estate loan and was deprived of the ability to lower her family's mortgage payment approximately $300.00 per month representing a present loss of about $3600.00 to date.

77. On or about May 20, 2009, and since, as a result of Defendants' debt collection misrepresentations and deceptions, Plaintiff's payment of a $400.00 appraisal fee for the real estate loan was lost as the appraisal is no longer valid.

78. As a result of Defendants' debt collection misrepresentations and deceptions, Plaintiff sustained damages including, *inter alia*, severe aggravation of Plaintiff's existing thyroid condition.

79. As a result of Defendants' debt collection misrepresentations and deceptions, Plaintiff sustained damages including, *inter alia*, severe mental distress, humiliation, and fear and physical manifestations of same such as crying spells, severe headaches, severe stomach upset, and weight changes.

## COUNT ONE
### (Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*)

80. Plaintiff repeats the foregoing Paragraphs as if each was reprinted herein below.

81. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) and is alleged to have owed a "debt" of a "personal, family, or household" nature as defined by 15 U.S.C. § 1692a(5).

82. Defendants are regularly engaged in the third-party collection of consumer debts and engaged in "communication[s]" as defined 15 U.S.C. § 1692a(2) and are "debt collector[s]" as defined 15 U.S.C. § 1692a(6).

83. The Defendants violated 15 U.S.C. § 1692, *et seq.*

84. In connection with the collection of the alleged debt, the Defendants violated 15 U.S.C. § 1692d(2) by stating that Plaintiff was scum of the earth and that she did not pay her bills like other Americans.

85. In connection with the collection of the alleged debt, the Defendants violated 15 U.S.C. § 1692e(2)(A) by failing to honor the First Settlement Amount and claiming that she owed more than the $3500.00.

86. In connection with the collection of the alleged debt, the Defendants violated 15 U.S.C. § 1692e(2)(A) by failing to honor the Second Settlement Amount and claiming that she owed more than the $4187.00.

87. In connection with the collection of the alleged debt, the Defendants violated 15 U.S.C. § 1692e(10) by stating that Plaintiff had until the end of May 2009 to make pay the settlement amount and then not honoring that term.

88. In connection with the collection of the alleged debt, the Defendants violated 15 U.S.C. § 1692e(10) by collecting $687.00 more than what Plaintiff owed ($4187.00 paid minus the $3500.00 agreed equate to a $687.00 overpayment).

89. In connection with the collection of the alleged debt, the Defendants violated 15 U.S.C. § 1692e(10) by failing to retire the alleged Target debt upon receiving the wired $4187.00.

90. As a direct and proximate result of the Defendants' violation of the 15 U.S.C. § 1692, *et seq.*, Plaintiff incurred pecuniary and nonpecuniary damages.

**WHEREFORE**, Plaintiff demands that judgment be entered against the Defendants for actual damages, statutory damages, costs, reasonable attorney's fees, interest, and other relief as may be just and proper.

## COUNT TWO
## (Pa. Unfair Trade Practices and Consumer Protection Act)

91. Plaintiff repeats the foregoing Paragraphs as if each was reprinted herein below.

92. The Defendants violated 73 P.S. § 201-1, *et seq*.

93. The Defendants violated 73 P.S. § 201-3 by failing to honor the First Settlement Amount and claiming that she owed more than the $3500.00.

94. The Defendants violated 73 P.S. § 201-3 by failing to honor the Second Settlement Amount and claiming that she owed more than the $4187.00.

95. The Defendants violated 73 P.S. § 201-3 by stating that Plaintiff had until the end of May 2009 to make pay the settlement amount and then not honoring that term.

96. The Defendants violated 73 P.S. § 201-3 by collecting $687.00 more than what Plaintiff owed ($4187.00 paid minus the $3500.00 agreed equate to a $687.00 overpayment).

97. In connection with the collection of the alleged debt, the Defendants violated 73 P.S. § 201-3 by failing to retire the alleged Target debt upon receiving the wired $4187.00.

98. As a direct and proximate result of the Defendants' violation of 73 P.S. § 201-1, *et seq*., Plaintiff incurred pecuniary and nonpecuniary damages.

**WHEREFORE**, Plaintiff demands that judgment be entered against the Defendants for actual damages, statutory damages, treble damages, costs, reasonable attorney's fees, interest, and other relief as may be just and proper.

### COUNT THREE
### (Pa. Fair Credit Extension Uniformity Act)

99. Plaintiff repeats the foregoing Paragraphs as if each was reprinted herein below.

100. The Defendants violated 73 P.S. § 2270.1, *et seq*.

101. The Defendants violated 73 P.S. § 2270.4 by violating 15 U.S.C. 1692 § 1692, *et seq*.

102. As a direct and proximate result of the Defendants' violation of the 15 U.S.C. 1692 § 1692, *et seq*., Plaintiff incurred pecuniary and nonpecuniary damages.

**WHEREFORE**, Plaintiff demands that judgment be entered against the Defendants for actual damages, statutory damages, treble damages, costs, reasonable attorney's fees, interest, and other relief as may be just and proper.

### COUNT FOUR
### (Declaratory Judgment)

103. Plaintiff repeats the foregoing Paragraphs as if each was reprinted herein below.

104. Defendants obtained on behalf of Target a state-court judgment against Plaintiff in the amount of approximately $6000.00.

105. The judgment acted as a lien on Plaintiff's real property.

106. The lien prevented the Plaintiff from closing on the refinance of her existing mortgage loan to obtain a new real estate loan with better terms and a lower monthly payment.

107. Plaintiff and the Defendants entered into a valid and enforceable settlement agreement, the First Settlement Agreement, where Plaintiff would pay $3500.00 in accord and satisfaction of the judgment in exchange for a zero-balance letter and evidence that the real estate lien would be released after the real estate loan closing.

108. Defendant unilaterally disavowed the First Settlement Amount by claiming it was good for less than one day while hiding that term from the Plaintiff.

109. Defendants unilaterally asserted that the Plaintiff now owed the Second Settlement Amount.

110. The Defendants preyed on Plaintiff's vulnerable situation and knew at all material times that she was under pressure to resolve the judgment so that her real estate loan would go through.

111. After Plaintiff paid the Second Settlement Amount in excess of the First Settlement Amount, the Defendants still claim that Plaintiff owes yet more money.

112. Defendants have refused to consider the judgment paid and failed to return the excess money Plaintiff was forced to send to the Defendants.

113. Plaintiff is unable to secure any real estate loan or refinancing of her existing real estate loan while Defendants refuse to mark the state-court judgment lien on her real estate paid and satisfied.

114. Plaintiff requests that the Honorable Court declare the rights of the parties and declare that the Plaintiff paid the judgment pursuant to the terms of the parties' First Settlement Agreement.

**WHEREFORE**, Plaintiff demands that declaratory judgment be entered against the Defendants for actual damages, costs, reasonable attorney's fees, interest, and other relief as may be just and proper.

**Plaintiff demands a trial by jury as to all Counts.**

BY: s/Joseph A. Mullaney, III
Joseph A. Mullaney, III, Esq.
**CONSUMER LITIGATION GROUP**
Law Office of Dimitrios Kolovos, LLC
211 West State Street, Suite 204
Media, PA  19063
Tel 610-616-5303
Fax 610-672-1944
Eml JMullaney@ConsumerLitigators.com